AS YOU SOW, as Sponsor of the As You Sow 401(k) Retirement Savings Plan, Deborah Niedermeyer, Trustee for the Deborah Niedermeyer Individual 401(k), Brian K. Allen, Trustee for the Brian Allen Photo Individual 401(k), Herbert E. Pounds, Jr., PC, as Sponsor of the Herbert E. Pounds, Jr., PC 401(k) Plan, RCSIM, Inc., as Sponsor Of the RCSim, Inc., 401(k) Plan, Robert C. Rosson, Edgar C. Phillips and James Edward Simpson, Plaintiffs,

v.

AIG FINANCIAL ADVISORS, INC., and Spelman & Co., Inc., Defendants.

No. 3:06–01171.

United States District Court, M.D. Tennessee, Nashville Division.

March 26, 2008.

## MEMORANDUM

WILLIAM J. HAYNES, JR., District Judge.

Plaintiffs, As You Sow, as Sponsor of the As You Sow 401(k) Retirement Savings Plan; Deborah Niedermeyer, Trustee for Deborah Niedermeyer Individual 401(k); Brian K. Allen, Trustee for the Brian Allen Photo Individual 401(k); Herbert E. Pounds, Jr., PC, as Sponsor of the Herbert E. Pounds, Jr., PC 401(k) Plan; RCSIM, Inc., as Sponsor of the RCSIM, Inc., 401(k) Plan, Robert C. Rosson, Edgar C. Phillips and James Edward Simpson, citizens of several states filed this action under 28 U.S.C. § 1332, the federal diversity statute against the Defendants: AIG Financial Advisors, Inc., ("AIG") and Spelman & Co., Inc. ("Spelman"), Delaware corporations. Plaintiffs assert claims under the Tennessee Securities Act, Tenn. Code Ann. § 48–1–101 *et seq.* as well as various state common law claims for negligent and grossly negligent supervision and fraud. Plaintiffs' claim arise from their placement of their "retirement assets" with Barry Stokes and his 1Point Solutions, LLC, company ("1 Point Solutions") during the period from 2002 through 2006. In essence, Plaintiffs contend that Stokes and 1 Point Solutions misappropriated their assets. Plaintiffs allege that Stokes and 1 Point Solutions were agents of the Defendants and that each Defendant is liable as a "control person" under Tennessee securities law and are also liable for Plaintiffs' common law claims under the doctrine of respondent superior and agency for Stokes's theft of Plaintiffs' retirement assets.

Before the Court is the Defendants' motion to dismiss (Docket Entry No. 8), contending, in sum, that Plaintiffs' claims are preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1111 *et seq.* In addition, Defendants

argue that as plan sponsors or plan trustees, Plaintiffs lack standing to maintain their TSA claims because Plaintiffs were neither purchasers nor sellers of securities nor are they injured parties under the TSA. Defendants further assert that neither of them is "control person" under the TSA nor was Stokes acting within the scope of his relationship with Defendants when he stole the Plaintiffs' assets that were placed with 1 Point. Defendants insist that they did not owe any legal duty to Plaintiffs to justify their common law claims. Finally, Defendants contend that Plaintiffs' first amended complaint lacks the requisite degree of particularity as to the time, place or content for their fraud claims.

In response, Plaintiffs assert, in essence, that ERISA is inapplicable to their claims because the Defendants are not ERISA fiduciaries and Sixth Circuit and other circuits allow an ERISA plan to assert state law claims against non-fiduciaries. Plaintiffs contend that as the actual purchasers of the stock for its members, Plaintiffs possess standing to assert their claims. In addition, Plaintiffs argue that Tennessee's securities law has a broader definition of a "controlling person" than federal securities law and does not require the Defendants' actual participation in their registered agent's conduct. Finally, Plaintiffs assert that their common law claims are adequately pled.

### A. Analysis of the First Amended Complaint

According to Plaintiffs' first amended complaint,[1] Stokes and 1 Point Solutions had offices in Dickson, Tennessee and provided various financial and investment services for Plaintiffs' retirement account assets. (Docket Entry No 46, First Amended Complaint at ¶ 11). Plaintiffs

allege that Stokes was a registered securities representative and investment advisor of AIG and/or Spelman during the years 2002–2006. Plaintiffs entrusted Stokes and 1 Point Solutions that Stokes operated, to use their monies to purchase securities and to provide assistance and investment services for their 401(k) plans and individual retirement plans. These plans typically invested in securities. Plaintiffs alleged that "1 Point Solutions provided plaintiffs with forms that allowed them to select from a list of options the specific securities in which their assets would be invested by 1 Point Solution". *Id.* ¶ 15. Further, "1 Point Solutions mailed plaintiffs periodic statements purporting to provide details about the securities in which plaintiffs' money had allegedly been invested". *Id.* 16. In a word, during this time period, Plaintiffs allege that "Stokes stole the money that Plaintiffs transferred to him" and misappropriate Plaintiffs' assets. ¶¶ 17 and 19. Stokes allegedly created fictitious account statements to cover his theft. *Id.* at ¶ 17.

As to Stokes' relationship with Defendants, Plaintiff alleged that from 2002 to 2006, Stokes was a registered securities representative with the Defendants AIG and/or Spelman. *Id.* at ¶ 12. Plaintiffs also allege that the Defendants were aware that Stokes was doing business through 1 Point Solutions, *id.* at ¶¶ 20–28, but that Stokes was the primary violator of the trust that Plaintiffs vested in him. at ¶¶ 11, 17, 19 and 34. Plaintiffs allege that under National Association of Securities Dealers ("NASD") rules, Defendants imposed a standard upon the Defendants' to supervise Stokes's securities related activity so as to prevent him from engaging in

---

**1.** The first amended complaint supercedes the original complaint. *Clark v. Tarrant County,* 798 F.2d 736, 740–41 (5th Cir.1986).

his improper activities to their detriment. *Id.* at ¶¶ 29 and 32.

### B. Conclusions of Law

 In deciding a Rule 12(b)(6) motion to dismiss, the Court can grant the motion only if the complaint's allegation "raise a right to belief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Yet, "the allegations of the complaint should be construed favorably to the pleader" *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and the Court must "treat all of the well-pleaded allegations of the complaint as true". *Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977).

### 1. ERISA Preemption

Defendants argue that ERISA preempts Plaintiffs' state law claims. The Supreme Court has observed that ERISA is "virtually unique with respect to federal statutes in that Congress expressed its clear intent that the federal courts exercise exclusive jurisdiction over *claims arising under funds or plans regulated by the ERISA statute.*" *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). As the Supreme Court observed:

> The statute further states that "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary," *except for actions by a participant or beneficiary to recover benefits due, to enforce rights under the terms of a plan, or to clarify rights to future benefits, over which state courts have concurrent jurisdiction.* § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, ERISA's legislative history indicates that, in light of the act's virtually unique preemption provision, see § 514,

29 U.S.C. § 1144, "a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." 120 Cong. Rec. 29, 942 (1974) (remarks of Sen. Javits). *Id.* at 24, n. 26, 103 S.Ct. 2841 (citation omitted and emphasis added).

 Yet, ERISA expressly excepts from its preemption "any law of any State which regulates ... securities." 29 U.S.C. § 1144(b)(2)(A). The extent of this statutory exception from ERISA's preemption turns on "the nature of the claim." *Smith v. Provident Bank,* 170 F.3d 609, 613 (6th Cir.1999) and whether the state law at issue "substantively regulates a relationship or merely provides alternative remedies." *Id.* at 615.

 Here, the TSA extensively regulates the sales of securities and the relationship of securities dealers and their registered agents. Tenn. Code Ann. § § 48–2–102 through 48–2–126. As to relationship of agents and securities dealers, Tenn. Code Ann. § 48–2–109(a) provides: "it is unlawful for any person to transact business from or in this state as a broker-dealer or agent unless such person is registered as a broker-dealer or agent under this part ...". Tenn Code Ann. § 48–2–109(b) reads: "The registration of an agent is not effective during any period when the agent is not associated with a particular broker-dealer registered under this part." Tennessee regulates securities in great detail. See Tenn. Admin. R & Regs. Ch. 0780–4–1 through 0780–4–4, comprising eighty four (84) pages. Tennessee has a separate set of regulations on securities dealers and their agents. Tenn. Admin. R & Regs. Ch. 0780–4–3.01 through 0780–4–3.15 that total forty nine (49) pages, including the requirements and prohibited acts of agents. See Tenn. Admin. R & Regs. Ch. 0780–4–3.02.

The Court concludes that Plaintiffs' TSA claims are not preempted by ERISA because the TSA extensively regulates the sales and management of securities, including the relationship between agent and securities dealers.

■ As to Plaintiffs' common law negligence and fraud claims, Plaintiffs pursue state law claims against the Defendants that are non-fiduciaries. Although ERISA provides the exclusive federal remedy for an ERISA plan, *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), including remedies under ERISA against a non-fiduciary party. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 246, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (broker dealer sued for violating ERISA).

Yet, the Sixth Circuit has permitted an ERISA plan to sue a non-fiduciary for state law claims for negligence and conversion. *Smith,* 170 F.3d at 612, 617. Other Circuits are in accord. *See e.g., Gerosa v. Savasta & Company,* 329 F.3d 317, 323 (2d Cir.2003) (negligence claim against a non-fiduciary); *Trustees of the AFTRA Health Fund v. Biondi,* 303 F.3d 765, 777–79 (7th Cir.2002), (a state-law fraud claim by a plan's trustees against a participant was not preempted because claim did not implicate ERISA's fundamental concerns); *LeBlanc v. Cahill,* 153 F.3d 134, 147–48 (4th Cir.1998) (common-law fraud claim by plan trustees against investment advisor that caused the plan's loss is not preempted); *Arizona State Carpenters Pension Trust Fund v. Citibank,* 125 F.3d 715, 723–24 (9th Cir.1995) (trustees' negligence and fraud claims against bank that held pension fund asserts were not preempted because they did not implicate or impair ERISA's policies and objectives); *Paysource, Inc. v. Triple Crown Financial Group,* 2005 WL 2095754, *3, 2005 U.S. Dist. LEXIS 34780, *12 (E.D.Ky.2005) (ERISA did not preempt ERISA plan's

negligence and fraud claims against brokers because plaintiffs' claims did not arise from ERISA plan, but from separate representations by the brokers).

Based upon these authorities, the Court concludes that Plaintiffs' State common law claims against the Defendants, non-fiduciaries, are not preempted by ERISA.

### 2. Plaintiffs' Standing under Tennessee Securities Laws

■ The Defendants contend that Plaintiffs as plans and trustees lack standing because the actual purchasers of the securities are the members of the plans. The Tennessee Securities Act ("TSA") authorizes a damages claim for purchasers and sellers of securities. Tenn.Code Ann. § 48–2–122. The Tennessee Securities Act, Tenn.Code Ann. § 48–2–101, *et seq.,* draws upon the language of its federal counterpart. *Constantine v. Miller Indus., Inc.,* 33 S.W.3d 809, 813 (Tenn.Ct. App.2000) ("the language of the Tennessee Securities Act of 1980 continues to closely follow federal securities law Rule 10b–5"). In interpreting the TSA, Tennessee courts consider interpretations of the federal securities laws for guidance on the TSA. *Constantine,* 33 S.W.3d 809, 813 (finding that reliance is required under the Tennessee Securities Act based on interpretations of Rule 10b–5 of the Federal Securities Exchange Act). Yet, the Tennessee Supreme Court has since construed TSA as broader than the federal securities laws and directed that the TSA be "liberally construed to protect investors." *King v. Pope,* 91 S.W.3d 314, 323(Tenn.2002). In King, the Tennessee Supreme Court held that the "investment contract" test under the TSA grants broader protection than the federal securities laws. *Id.*

For their contention that the Plaintiffs, as plan sponsors, cannot maintain their TSA claims on behalf of their employee

retirement plans, the Defendants cite *Prudential Ins. Co. v. BMC Indus., Inc.*, 655 F.Supp. 710 (S.D.N.Y.1987). In Prudential, the district court held the plan sponsor lacked standing because the plan sponsor was not the actual purchaser or seller of the securities at issue, but rather was a trustee of the plan. In such instances, that court found that the actual injured party was not the plan, but those persons who benefit from the plan.

> To have standing to bring an action under Rule 10b–5 a plaintiff must be a purchaser or seller of securities. It is undisputed that it was [the plan trustee], not [the plan sponsor], that purchased the BMC securities and who is the "legal" or "record" owner of the securities. Nevertheless, [the plan sponsor] argues that it falls within the doctrine of law that recognizes the standing of a beneficiary of a trust to bring a securities fraud claim even when the securities were technically purchased by the beneficiary's trustee.

> In the cases cited [by the plan sponsor], however, the trust beneficiaries were not only participants in the purchase or sale, but also were the parties actually harmed by the securities transaction in question and as such were de facto sellers or purchasers. In this case the entities actually harmed are the retirement plans and the employees for whose benefit they were established. While it is true that the retirement plans act through their Administrator and Sponsor and Named Fiduciary, this court would have to go beyond the cited cases to conclude that [the plan sponsor] has standing to sue as well. [The plan sponsor] is not an injured party "whose interests the statute was designed to safeguard."

*Id.*

Other courts have held that only persons or entities creating the trust or plan possess standing to bring claims for the maladministration of the trust. *See, e.g., Associated Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund*, 700 F.2d 1269, 1278 (9th Cir.1983) (employer/plan sponsor lacked standing to sue trustees under ERISA for failure to allege "'specific and personal' injuries"); *Donald I. Galen, M.D., Inc. v. McAllister*, 833 F.Supp. 761 (N.D.Cal.1992) (employer/plan sponsor lacked standing to maintain ERISA claims for lack of any injuries arising out of the alleged ERISA violation); *Morse v. Bank One*, 2005 WL 3541037, at *4, 2005 U.S. Dist. LEXIS 36662, at *26 (E.D.La. Nov. 1, 2005) (settlor of charitable trust could be limited only to sellar's beneficial interest who retained a beneficial interest in the trust property lacked standing to bring claims against the trustee on behalf of other beneficiaries).

In response, Plaintiffs contend that ERISA authorizes plans to file legal actions. 29 U.S.C. 51132(d) (granting retirement plans the right "to sue and be sued like corporations and other legal entities"). The Sixth Circuit has recognized a Plan's ability to sue. *Saramar Aluminum Co. v. Pension Plan for Employees of the Aluminum Indus.*, 782 F.2d 577, 581 (6th Cir. 1986) (a plan may sue as a fiduciary under ERISA). Other courts have held that beyond the confines of ERISA, an ERISA plan may assert non-ERISA claims. *Thrift Inn. Plan v. Magnuson*, 2006 U.S. Dist. LEXIS 74670, *40 (N.D.N.Y. 2006)(ERISA plan had standing to pursue accounting malpractice and negligence claims); *Framingham Union Hosp., Inc. v. Travelers Ins. Co.*, 721 F.Supp. 1478, 1487, 1490 (D.Mass.1989) (ERISA plans allowed to sue for tort claims).

A trustee of a retirement plan was held to have standing to sue for securities violations. *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Insurance Co.*, 698 F.2d 320, 325–26, 328 (7th

Cir.1983). In Peoria Union, the Seventh Circuit reasoned that the "trustees have standing." They signed the contract and were therefore the purchasers of the security. 698 F.2d at 325–26. To be sure, that Court also stated that "[t]he plan itself does not have standing. The assets of the plan are held in trust and must be, see 29 U.S.C. § 1103(a), but the trustee is the proper party to sue on behalf of the trust." *Id.* Although *Peoria Union* did not recognize standing for the Plan, a district court permitted a securities actions on behalf of an ERISA benefit plan. *Holmes v. Bartlett,* 2004 WL 793190, *2–4, 2004 U.S. Dist. LEXIS 10099, *9–12 (D.Or.2004). In Holmes, the plans and their trustees, as owners of the assets at issue were deemed to be the purchasers and/or sellers of securities as well as the ultimate beneficiaries. 2004 WL 793190 at *2–3, 2004 U.S. Dist. LEXIS 10099 at *10. The Holmes court reasoned: "The plaintiff in ERISA purchased the stock and retained ownership of the stock for the benefit of the Plan participants. Plaintiff is a purchaser of securities and has standing to assert claims for improper activity relating to the sales of the securities". 2004 WL 793190 at *3. Thus, the ERISA plan had standing to sue for securities violations.

This Court is persuaded by these latter decisions that acknowledge the marketplace realities and the legal obligations of trustees and ERISA plans in the purchase of these securities. In addition, the individual participants elected to invest as a group. This Court concludes that Plaintiffs that are ERISA plans or trustees possess the standing under the TSA to pursue their TSA claims. To grant such standing serves to aid enforcement of TSA

and is consistent with TSA's remedial purpose and Tennessee Supreme Court's standard that the TSA be "liberally construed." *King,* 91 S.W.3d at 314.

### 3. The "Controlling Person" under the TSA

Defendants next contend that for Plaintiffs' TSA claims, neither of them is a "controlling person" of Stokes or 1 Point's activities. Thus, Defendants argue that they cannot be liable on Plaintiffs TSA claims.

██ Plaintiffs specifically name Stokes as the primary violator who used 1 Point to accomplish his thefts. (Docket Entry No. 46, First Amended Complaint at ¶¶ 11, 17, 19, and 34). Plaintiffs also asserts that Stokes was a registered securities representative of the Defendants. *id.* at ¶ 12 and this status enabled Stokes to sell securities to Plaintiffs and subjected the Defendants to industry rules to supervise Stokes. Plaintiffs argue that by virtue of Stokes's status as a registered agent of the Defendants, "in the exercise of reasonable care [the Defendants] could ... have known of the existence of the facts by reason of which the liability is alleged to exist," quoting Tenn.Code Ann. 48–2–122(g). Plaintiffs also cite NASD Rule 3040 that requires the Defendants to supervise any securities-related activity of their registered agents so as to prevent their agents from engaging in illegal activity. In Plaintiffs' view, this NASD rule conveys the power upon the Defendants to control securities-related activities of Stokes, their agent.

TSA's provision on a controlling person liability, Tenn.Code Ann. § 48–2–122(g) [2] that reads as follows:

---

**2.** A language difference exist in Tenn.Code Ann. § 48–2–122(g) from Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t Section 15 of the 1933 Act and Section 20(a) of the 1934 Act. Those Acts impose legal responsibilities upon the "controlling person" in a

securities firm for Securities Act violations by their agents, subject to certain defenses Section 15 of the 1933 Act provides as follows:

> Every person who, by or though stock ownership, agency, or otherwise or who, pursu-

(g) Every person who directly or indirectly controls a person liable under this section, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person who wanted to be liable under this subsection (g) proves that the person not have known of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Section 48–2–122(g) has not been interpreted by Tennessee state courts [3] As stated earlier, the Tennessee Supreme Court requires the TSA to be "liberally construed" so as to protect investors. *King*, 91 S.W.3d at 324.[4]

In construing § 48–2–122(g), the Court considers other pertinent provisions of the TSA. Term.Code Ann. § 48–2–109(a) provides that "it is unlawful for any person to transact business from or in this state as a broker-dealer or agent unless such person is registered as a broker-dealer or agent under this part...." Tenn Code Ann. § 48–2–109(b) reads as follows: "The registration of an agent is not effective during any period when the agent is not associated with a particular broker-dealer registered under this part." As applied here, under Tennessee securities law, Stokes could not have lawfully engaged in the

---

ant to or in connection with an agreement or understanding with one or more other persons by and though stock ownership, agency, or otherwise, controls any person liable under § 77(k) or 77(*l*) of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the control person is alleged to exist. (Emphasis added.)
15 U.S.C. § 77a Similarly, Section 20(a) of the 1934 Act provides:
 a. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action (Emphasis added).
Under federal securities law, the **controlling person must be actual participation and control** of the specific activity at issue. *Sanders Confectionery Prods. v. Heller Fin., Inc.*, 973

F.2d 474, 486 (6th Cir.1992)(emphasis added). "[E]ssential elements" of a control person is of "power to control the specific transaction or activity upon which the primary violation is predicated" **and** "actual participation (i.e., exercise control) in the operations of the primary violator in general" (emphasis added). "Because 'controlling person' liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act." *D.E. & J. Limited P'ship v. Conaway*, 133 Fed.Appx 994, (6th Cir.2005). Accord *In re Prison Realty Secs. Litig.*, 117 F.Supp.2d 681, 692 (M.D.Tenn. 2000) and *Azzolini v. Corts Trust 11 for Provident Financial Trust 1*, 2005 WL 2253971 at *13–14, 2005 U.S. Dist. LEXIS 31853 at *42 (E.D.Tenn. Sept. 16, 2005).

**3.** This Court interpreted Section 48–2–122(g) in *Cannon v. GunnAllen Financial, Inc.*, 2007 WL 2351313 (M.D.Tenn. Aug. 14, 2007) that is discussed infra.

**4.** *King* post-dates *Constantine v. Miller Industries, Inc.*, 33 S.W.3d 809 (Tenn.App.2000), upon which the Defendants rely for their argument that the court should follow federal court interpretations of the federal securities laws.

sales of securities in Tennessee, but for his status as a registered agent with the Defendants.

As noted earlier, in *Cannon* that is cited by Defendants, the Honorable Aleta Trauger of this Court applied the federal "controlling person" test to the TSA's controlling person provision in Section 48–2–122(g). The *Cannon* rationale was that:

Although the court recognizes that "state and federal regulations serve different purposes," because "states enacted securities regulation to protect investors," while "[f]ederal securities regulations ... were enacted to serve the broader purpose of protecting the integrity of the increasingly nationalized market," it also notes the Tennessee General Assembly's directive that the TSA should be interpreted to, among other things, "coordinate the interpretation and administration of this Act with related federal ... regulation." *See King*, 91 S.W.3d at 319, 322. To interpret differently language that is nearly identical could lead to marked confusion, particularly among courts tasked with applying both TSA Section 48–2–122(g) and SEA Section 78(f). *See, e.g., Nichols*, 706 F.Supp. at 1348. Such would not comport with the General Assembly's directive. Additionally, lending the control person portion of Section 48–2–122(g) the same meaning as the control person provision of Section 78(t) does not appear to undermine the TSA's ability to protect investors. As such, this court will interpret the TSA's control person provision in the same manner as the Sixth Circuit would require it to interpret Section 78(t) of the Securities and Exchange Act ("SEA"), i.e., it will analyze whether plaintiffs seeking to state a claim under Section 48–2–122(g) have alleged (1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual participation (i.e., exercise control) in the operations of the primary violator in general. *See In re Prison Realty Secs. Litig.*, 117 F.Supp.2d at 692.

2007 WL 2351313 *4. Thus, Cannon defined "controlling person" under the TSA consistent with federal law so as to require the Defendants' actual participation in Stokes's wrongful conduct.

In *King*, the Tennessee Supreme Court actually declined to follow federal securities law on the proper interpretation of an "investment contract" in the TSA notwithstanding the statute on coordination of federal and state securities laws. As the Tennessee Supreme Court explained:

In 1971, the Hawaii Supreme Court became one of the first state courts to openly reject the *Howey* test and formulate a more flexible test for determining which transactions constitute an investment contract under its state securities laws. *See State v. Hawaii Market*, 52 Haw. 642, 485 P.2d 105 (1971).

\* \* \*

The Hawaii Supreme Court utilized the concepts from "risk capital theory," stating that the "subjection of the investor's money to the risks of an enterprise over which he exerts no managerial control is the basis economic reality of a security transaction." *Id.* [at 109].

\* \* \*

A few years after the *Hawaii Market* decision, the United States Supreme Court revisited the test adopted in Howey, Responding to the criticism of *Howey*, the Court in Forman emphasized that in determining whether a particular transaction is an investment contract and thus a "security," the focus must be

on "the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). To this end, the Court stated that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Id.* at 852, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621. Thus, the "Howey–Forman" test emerged as the new, more flexible federal test for what constitutes a security.

Against this backdrop, in 1996, the Tennessee Court of Criminal Appeals elected to employ the *Hawaii Market* test to determine whether the transaction in question was an investment contract under Tennessee law. *See Brewer*, 932 S.W.2d at 14. In support of its decision, the Brewer court noted that, as of 1996, seventeen jurisdictions had adopted the *Hawaii Market* test. *See id.* at 13 n. 13. Furthermore, *Brewer* highlighted the similarities between the two tests as follows:

> The first prong of the *Hawaii Market* test is nothing more than the investment concept of the *Howey–Forman* test. The second prong adopts the concept of risk capital, whereas *Howey–Forman* focuses on the existence of a common venture, i.e., vertical or horizontal commonality. The third prong of *Hawaii Market* utilizes the more liberal concept of the expectation to receive a "benefit" instead of the slightly more restrictive concept of "profits" found in *Howey–Forman*. Lastly, the fourth prong makes explicit, in layman's terms, the *Howey–Forman* principle that the investor exercises no managerial control.

\* \* \*

In adopting the *Hawaii Market* test, the *Brewer* court noted that *DeWees* mandated liberal construction of securities laws to protect the public and that the *Hawaii Market* test better serves the remedial purpose of Tennessee's securities laws by embracing not only "obvious and commonplace" investment schemes, but also " 'the countless and variable schemes devised by those who seek the money of others on the promise of profits.' " *Id.* at 14 (quoting *Howey*, 328 U.S. at 299, 66 S.Ct. 1100, 90 L.Ed. 1244). Additionally, the *Brewer* court deemed the *Hawaii Market* test superior in providing detailed statements of its elements in layman's terms, which promotes the proper administration of justice by the jury. *Id.*

In this case, the test adopted in *Brewer* was applied by the administrative law judge, the Commissioner, and the chancery court. However, the Court of Appeals adopted the *Howey–Forman* test used by the Sixth Circuit in *Cooper v. King*, No. 96–5361, 114 F.3d 1186, 1997 WL 243424, at \*2 (6th Cir. May 9, 1997), an unpublished case involving the sale of pay telephones in the same manner and under the same terms as in the present case.

After careful consideration, we conclude the Court of Appeals erred in adopting the *Howey–Forman* test. The appropriate test for defining an "investment contract" under Tennessee law is the *Hawaii Market* test adopted in *Brewer*. First, the General Assembly has stated that the Tennessee Securities Act of 1980 should be interpreted "to effectuate its general purpose to protect investors" and "to coordinate the interpretation and administration of this Act with related federal and state regulation." 1980 Tenn. Pub. Acts, ch. 866, § 25. As not-

ed by the Brewer court, the *Hawaii Market* test better serves the remedial purpose of Tennessee's securities laws by embracing not only "obvious and commonplace" investment schemes, but also "'the countless and variable schemes devised by those who seek the money of others on the promise of profits.'" *Brewer*, 932 S.W.2d at 14 (quoting *Howey*, 328 U.S. at 299, 66 S.Ct. 1100, 90 L.Ed. 1244). As previously explained, state and federal regulations serve different purposes. While the federal test is tailored to federal law, the *Hawaii Market* test adopted in Brewer is more in keeping with the public policy espoused by this Court in *DeWees* because it presents a more flexible definition of "investment contract."

91 S.W.3d at 321–22 (emphasis added and citations omitted).

■ Based upon the above cited reasoning in *King*, this Court respectfully disagrees with *Cannon* that coordination of the TSA and the federal securities laws is the dispositive consideration. Applying *King's* remedial interpretation of the TSA, the Court concludes that the "controlling person" of the TSA includes a securities dealer that "indirectly" controls its registered agent[5]. Here, Stokes could not sell these securities without the Defendants' designation of him as their registered agent. The Court concludes that a reasonable person could conclude that by this designation, the Defendants materially aided Stokes by enabling his violations of TSA unless the Defendants can satisfy the affirmative defense in Section 48–2–122(g). Given the Defendants' ability to control Stokes' sales of securities under NASD

rules, the Court concludes that Plaintiffs have sufficiently pled "controlling person" liability under the TSA.

■ A related theory of liability under the TSA is that the Defendants aided and abetted Stokes' TSA violations. Plaintiffs note that other State courts have imposed as secondary liability, consistent with the Uniform Securities Act and on parties without the necessity of showing material or culpable participation. *See e.g., Foster v. Jesup and Lamont Secs. Co.*, 482 So.2d 1201, 1207 (Ala.1986); *Kirchoff v. Selby*, 703 N.E.2d 644, 651 (Ind.1998); *Taylor v. Perdition Minerals Group, Ltd.*, 766 P.2d 805, 808–10 (1988); *Mitchell v. Beard*, 256 Ark. 926, 513 S.W.2d 905, 907 (1974); *Steenblik v. Lichfield*, 906 P.2d 872, 879 (Utah 1995). In King, the Tennessee Supreme Court relied on other state courts decisions in construing the TSA.

Given *King's* approach and the authorities cited from other States, this Court concludes that the aiding and abetting theory is viable under the TSA.

### 6. The Sufficiency of Plaintiffs' TSA and Fraud Claims

Defendants challenge the sufficiency of the pleading of Plaintiffs' state securities claim as well as their common law fraud claim, contending that Plaintiffs' complaint fails to meet the particularity requirements under Fed.R.Civ.P. 9(b). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or with particularity". The Sixth Circuit's minimum requirement for Rule 9(b) are that complaint must "allege the time, place, and content of the alleged

---

**5.** A federal circuit has held under federal law that a broker dealer is a controlling person with respect to its registered representative. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1573–74 (9th Cir.1990). The Securities and Exchange Commission has held that a broker dealer will be deemed to have "tacitly approved" an agent's outside securities transactions if the firm is aware of and fails to stop such activities. *In Re Raymond James Financial Services, Inc., Exchange Act Rel.*, 2005 WL 2237628, 296, 2005 SEC LEXIS 2368 (Sept. 15, 2005).

misrepresentation on which he or she relied: the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993).

The purpose of Rule 9(b) is that: "with particularity, especially when the fact of the complaint reveals that the complaint is filed after the applicable statute of limitations has run and the viability of the claim is totally dependent on a late discovery rule." *Northwestern Nat'l Ins. Co. v. Joslyn*, 53 F.3d 331, 1995 WL 270995, *3 (6th Cir.1995). In a word, "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud. Generalized and conclusory allegations that the Defendants' conduct was fraudulent do not satisfy Rule 9(b)." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir.2001) (citation omitted).

█ Here Plaintiffs' complaint alleges that "Plaintiffs reasonably relied on Mr. Stokes' representations and were unaware of the true facts" (Docket Entry No. 46. First Amended Complaint ¶¶ 35, 53). Plaintiffs allege that Stokes stole their monies that Plaintiffs transmitted to 1 Point Solutions, a third party company that Stokes controlled. Plaintiffs refer to the "2002–2006" time period as the time during which they each "entrusted" monies to 1 Point Solutions. (Docket Entry No. 46, First Amended Complaint at ¶ 14). Plaintiffs plead the provisions of § 48–2–122(g) that the Defendants had the authority to control Stokes's conduct and theft as their agent and industry trade rules that require their supervision of Stokes.

Here, the general limitation period for TSA claim is three (3) years. Tenn.Code Ann. § 48–2–122(h) (three year limitations period for private actions brought under the Tennessee Securities Act). The same limitation exist for Plaintiffs' other claims.

*Vance v. Schulder*, 547 S.W.2d 927, 932 (Tenn.1977)(holding that the limitations period for "injuries to personal property" governed action for loss in value sustained by fraud and deceit); Prism Partners. *L.P. v. Figlio*, 1997 WL 691528, 1997 Tenn. App. LEXIS 777 (Tenn.Ct.App.1997)("In Tennessee, the statute of limitations for fraud is three years.").

This Court deems Plaintiffs' allegation that from 2002 to 2006, Stokes stole their investment monies placed with him, in the manner described, are sufficient to satisfy the requirements of Rule 9(b) on Plaintiffs' TSA and common law fraud claim. As to the statute of limitations issue, this action was filed in December 2006. Thus, there may well be material issues with respect to the extent of any recovery for the allegedly fraudulent activity that occurred before December 2003. In this district, Rule 9(b) has been held satisfied by allegations of systematic fraudulent conduct over the course of a twelve (12) year period. *Pogue v. Am. Healthcorp. Inc.*, 977 F.Supp. 1329, 1332–33 (M.D.Tenn.1997).

### 6. Plaintiffs' State Common Law Claims

█ Defendants again argue that Plaintiffs, as the plan sponsors, lack standing to assert their state common law claims, citing *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn.1976). For the reasons stated on the TSA claims, the Court concludes that Plaintiffs possess standing to pursue their state law claims.

In a related argument, Defendants also contend that Plaintiffs' amended complaint fails to allege that Stokes was acting within the course and scope of his affiliation with Defendants when Stokes allegedly stole monies which they now seek to recover. Defendants also argue that even if Plaintiffs were to allege an agency relationship, the respondeat superior claims would still fail because Mr. Stokes' theft

was so obviously driven purely by personal gain that his actions exceeded the scope of any agency relationship as a matter of law.

 A principal is liable for the negligence or wrongful facts of its agent acting within the actual or opponent scope of his employment in the principal's service. *Willis v. Settle,* 162 S.W.3d 169, 182 (Tenn.App.2004) ("respondeat superior liability exists when the principal has the right to control the agent"). *Tennessee Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.,* 840 S.W.2d 933, 937–38 (Tenn.Ct. App.1992). In addition, the agent's conduct must be "actuated at least in part, by a purpose to serve the master". *Tenn. Farmers,* 840 S.W.2d at 938 (citing Restatement (Second)of Agency 5228 (1957)). *See also Smith v. Keyport Self–Storage,* 2000 WL 558604, *4, 2000 Tenn.App. LEXIS 301, *11 (Tenn.Ct.App. May 5, 2000).

 Defendants cite *Tenn. Farmers Mutual Ins.* and the Restatement of Agency, Second, for the proposition that fraudulent conduct cannot be within the scope of an agency relationship unless the agent acts, at least in part, to benefit the principal. As a supreme court decision, *Willis* controls. In addition to *Willis,* other courts hold that under Tennessee law if an agent is acting within the scope of an agency relationship commits fraud, the principal is liable even if the agent acts entirely for his own benefit. *Doane Agricultural Service, Inc. v. Coleman,* 254 F.2d 40, 43 (6th Cir.1958) (under Tennessee law, "principal is responsible for the tortious acts of his agent if he has a right to control the agent"). *See also McReynolds v. McReynolds,* 1992 WL 14127, *2, 1992 Tenn.App. LEXIS 99, *5 (Tenn.App.2002) citing Restatement of Agency (Second) § 262.

From the Court's prospective, Stokes's theft occurred only because the Defendants enabled him to sell securities as their registered agent. A reasonable in-ference is that Stokes's agent status with the Defendants aided the Defendants' presence in the market place. Stokes's duty was to complete securities transactions in accordance with securities laws and NASD rules. To that extent, the acquisition and disposition of Plaintiffs' assets were within the actual scope of Stokes's duties as the Defendants' agent. Federal courts that have held that broker-dealers are liable under principles of *respondeat superior* where their affiliated agents steal client's money. *See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir.1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter. Inc.,* 448 F.Supp.2d 333 (D.P.R.2006). A contrary rule would cause injury unfair to the investing public.

 As to Plaintiffs' common law negligent supervision claim for the Defendants' negligent or grossly negligent supervision of Stokes's, their registered representative, Tennessee recognizes the common law tort of negligent supervision. *Darling v. J.B. Expedited Servs.,* 2006 WL 2238913, *28, 2006 U.S. Dist. LEXIS 54000, *81 (M.D.Tenn.2006); *Hays v. Patton–Tully Transp. Co.,* 844 F.Supp. 1221, 1223 (W.D.Tenn.1993). Under Tennessee law, "in general, all persons have a duty to use reasonable care to refrain from conduct that will foreseeable cause injury to others." *Biscan v. Brown,* 160 S.W.3d 462, 478 (Tenn.2005). A common law duty may be based on a statute even if the statute does not create an independent private right of action under the statute. *Draper v. Westerfield,* 181 S.W.3d 283 (Tenn.2002). In *Draper,* common law negligence claims against a physician were asserted based upon violations statutory duties to report child abuse. As to the defendant's argument that statute did not create an actionable

claim. The Tennessee Supreme Court stated:

> Dr. Westerfield contends that ... he is not subject to civil liability because T.C.A. § 37–1–401 ... does not create a "private right of action" for failure to report suspected child abuse.... A careful reading of Mrs. Draper's complaint and amended complaints, however, reveals that she did not allege an independent statutory right of action of action for violation of T.C.A. § 37–1–403 (1996) ... Mrs. Draper brought a common law negligence claim against Dr. Westerfield based upon his alleged failure to report suspected child abuse. A statutory right of action and a common law negligence action are two distinct bases of civil liability.

*Id.* at 291–92 (emphasis added). Whether a duty exist depends on a careful scrutiny of all the facts and may involve questions of fact that must be decided by the jury. *Kelley v. Middle Tenn. Emergency Physicians, P.C.*, 133 S.W.3d 587, 597 (Tenn. 2004).

▮▮▮ Plaintiffs cite precedents recognizing that in securities industry, the Defendants, as securities dealers, engage in a "business [that] includes the supervision of large corps of registered representatives." *WMA Securities, Inc. v. Ruppert*, 80 F.Supp.2d 786, 790 (S.D.Ohio 1999). Plaintiffs also cite NASD rules that require the Defendants to supervise any securities-related activity of their agent, Stokes, to prevent him from engaging in illegal activity. A condition of their right to engage in the securities business, broker dealers and securities agents are required to abide by the NASD's rules and regulations. Article IV, Sec. 1(a) of the by-laws of the NASD provide that any firm applying for membership agrees to be bound by the Rules of the Association. Article V, Sec. 2(a) requires the same undertaking by any person seeking to be come a registered representative. See appendices eleven and twelve. NASD Rule 3040 provides that when a broker dealer becomes aware that an affiliated agent is engaging in a "private securities transaction," the broker dealer must either supervise as if the transaction were executed on behalf of the broker dealer, or disapprove it, in which case the agent "shall not participate" in the transaction. Rule 3040(c). "Rule 3040 is intended to protect investors from the hazards of unmonitored private securities transactions." *In re Application of Joseph Abbondante*, Exchange Act Rel. No. 53066, 2006 WL 42393, *11–12, 2006 SEC LEXIS 23, *52–53 (Jan. 6, 2006). Thus, the rules of the NASD are an implicit part of and control the relationship between a broker dealer and its agent.

To be sure, violations of NASD rules alone do not give rise to actionable claims. *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 493 (6th Cir.1990) (private right of action does not exist for alleged violation of NASD rules). *See also Vanderbilt Univ. v. Henderson*, 2001 WL 1216980, *3, 2001 Tenn.App. LEXIS 762, *9 (Tenn.Ct. App. Oct. 12, 2001). Yet, under Tennessee law, governmental and trade regulations assist Tennessee and other courts in defining the extent of a legal duty at common law as "professionals are judged according to the standard of care required by their professions." *Hale v. Ostrow*, 166 S.W.3d 713, 717 (Tenn.2005) (local ordinance cited in resolving duty issue). *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 34–35 (Tenn.1988) (OSHA regulations cited in negligence action). *Dooley v. Everett*, 805 S.W.2d 380, 384–85 (Tenn.App.Ct.1990). NASD Rule 3040 is an industry rule that has been held relevant in determining if a defendant had the "means and ability" to control an agent for state law claims. *See e.g., Piper, Jaffray & Hopwood, Inc. v. Ladin*, 399 F.Supp. 292, 299 (S.D.Iowa

1975) (although NASD and NYSE rules are admissible as indicia of proper standard of conduct in negligence case); *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 333 (5th Cir.1981) (NASD and NYSE rules are excellent tools to assess reasonableness of broker's conduct); *Merrill Lynch v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1988) (violation of NASD rule is evidence of broker's negligence); *Scott v. Dime Savings Bank*, 886 F.Supp. 1073, 1080–81 (S.D.N.Y.1995) (same); *Javitch v. First Montauk Fin. Corp.*, 279 F.Supp.2d 931, 938 (N.D.Ohio 2003) (NASD rules are evidence of the reasonable standard of care in the securities industry).

As the Defendants agreed to supervise Stokes under NASD standards, the Defendant share a responsibility for these securities transactions under NASD standard, Stokes agreed to comply with defendants' supervision. Stokes's activities here were within the scope of his agency relationship between Defendants. Broker dealers may not enjoy the benefits of their relationships with affiliated agents without discharging their supervisory duties, including the supervision of private securities transactions. Significantly, the NASD defines "private securities transaction" as a transaction "outside the regular course or scope" of the affiliation. Rule 3040(e) (emphasis added). A private securities transaction is therefore not outside the scope of the affiliation, but simply outside the "regular" or primary scope. Consistent with these principles, the Sixth Circuit has held that "a dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business," even when the investor had no accounts with the firm. *Vestax Securities Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir.2002).

For this tort, numerous courts have ruled that broker dealers may be held liable under the common law for negligently supervising their registered representatives, even on dealings with investors who had no accounts with the firm. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750 (3d Cir.1990): *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454 (9th Cir.1986); *Berthoud v. Veselik*, 2002 WL 1559594, *6–7, 2002 U.S. Dist. LEXIS 12858, *17–18 (N.D.Ill., June 15, 2002); *Javitch v. First Montauk Fin. Corp.*, 279 F.Supp.2d 931, 940 (N.D.Ohio 2003) (denying motion to dismiss claims that brokerage firm had negligently supervised its broker); *Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 821, 857 N.E.2d 621 (2006) (affirming multi-million dollar verdict in investor suit alleging negligent supervision by broker dealer).

The Court concludes that as a matter of Tennessee law, Stokes' transactions are shown as within the scope of his relationship with Defendants because in the securities industry, the Defendants, as securities dealers with registered agents had a duty to supervise Stokes's transactions.

Defendants' rights and obligations to control the conduct in question gives rise to respondeat superior liability. *Willis*, 162 S.W.3d at 182. Other federal courts have held that broker dealers are liable under principles of respondeat superior when their affiliated agents steal client's money. *Henricksen v. Henricksen*, 640 F.2d 880, 887 (7th Cir.1981), cert. denied, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter, Inc.*, 448 F.Supp.2d 333 (D.P.R.2006).

For the reasons discussed above on NASD rules, the Court concludes the Plaintiffs have stated claims for inadequate supervision of Stokes by these Defendants.

■ As to Plaintiffs' common law fraud claim, Plaintiffs allege that Stokes agreed to provide professional services to plaintiffs while intending from the outset to steal the Plans' funds and did so. (Docket

Entry No. 46, Amended Complaint at ¶¶ 4, 14). Stokes' failure to disclose his intent not to handle plaintiffs' assets appropriately constitutes a material omission that also constitutes fraud. *Keith v. Murfreesboro Livestock Market,* 780 S.W.2d 751, 754 (Tenn.Ct.App.1989). Plaintiffs' allegations, if true, constitute fraud. *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (when a broker sells securities with the secret intent to misappropriate the funds, the conduct constitutes fraud). *See also Henricksen v. Henricksen,* 640 F.2d 880 (7th Cir.1981); *Alvarado v. Morgan Stanley Dean Witter, Inc.,* 448 F.Supp.2d 333 (D.P.R.2006). Stokes' alleged conduct also constitutes promissory fraud in violation of Tennessee common law. *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn.1978) (promise of future conduct made with intent not to perform is actionable fraud).

### CONCLUSION

For the reasons set forth above, the Court concludes that the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.